IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| MELINDA PALMER, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Civil Action No. 6:19-cv-00082 |
| | § | |
| PROCOLLECT, INC. and TRANS UNION, LLC, | § | |
| | § | |
| | § | |
| *Defendants*. | § | |

**DEFENDANT PROCOLLECT, INC.'S REPLY TO PLAINTIFF MELINDA PALMER'S OPPOSITION TO DEFENDANT PROCOLLECT, INC.'S MOTION FOR SUMMARY JUDGMENT**

Defendant ProCollect Inc. ("ProCollect" or "Defendant") files its *Reply* to *Plaintiff Melinda Palmer's Opposition to ProCollect, Inc.'s Motion for Summary Judgment* [Doc. 34] (the "Response"), and respectfully shows the Court as follows:

I.

PLAINTIFF'S MISLEADING STATEMENTS TO THE COURT

1. While I agree with the late British poet and satirist, Samuel Butler, irony and sarcasm is not argument,[1] the number of false and misleading statements in the Response about ProCollect's alleged false and misleading statements must be highlighted.

[1] "Neither irony or sarcasm is argument." *Samuel Butler*

2. For example, the Response repeatedly provides that Plaintiff received collection notices that ProCollect sought $3400 from Plaintiff.[2] Yet, there are no such collection notices/letters in the summary judgment record where ProCollect seeks $3,400 (nor $3,401 nor $3,400.69).[3] Plaintiff also repeatedly misrepresents that ProCollect did not properly verify the debt or misrepresented the amount of the debt.[4] However, these are bald allegations with support. Plaintiff fails to present **any** competent evidence that

---

[2] *See e.g.*:

"Ms. Palmer was shocked to receive debt collection notices from Defendant showing the she purportedly owed $3,400 to the apartment complex, for which Defendant was collecting. Response p. 1.

"This case is like *Gomez* in that, ProCollect also sent an [sic] debt collection letter demanding an unsupported $3,400, which it then changed to $1,999 based on no reason but an unexplained "secret sauce" formula of ProCollect, but which it still reported to the credit agencies as $3,400 until suit was filed."

[3] Plaintiff continually uses the amount of $3,400 throughout the Response, however, ProCollect never sought to collect a rounded amount of $3,400 as provided by the evidence.

[4] *See e.g.*:

"Defendant cannot produce a scrap of evidence to show that Plaintiff ***ever*** owed $3,400 to the Original Creditor." Response p. 10.

"Defendant systematically and repeatedly misrepresented the amount and character of the debt it sought to collect." Response p. 9.

"To the present date, ProCollect has not given Plaintiff a verification of the amount of $3,400.00, or $1,999, or $2,25.69[sic] or 1,982.00 or any of the amounts alleged due at varying times." Response p. 6.

"To this day, Defendant has not substantiated any of the amounts collected [sic]." Response p. 12.

"To this day, Defendant cannot name a fixed amount owed by Plaintiff or the basis for the alleged debt following her moveout…, for which ProCollect is collecting a debt and reporting an unpaid balance to the credit reporting agencies for Plaintiff." Response p. 9.

ProCollect ever sought to collect, or reported an amount, *other than the exact amounts claimed due at the time by the Original Creditor*, nor did Plaintiff ever provide ProCollect with any notice that the amounts were not calculated correctly under the Lease. Rather, Plaintiff blindly disputed the debt multiple times authored and sent by a debt repair company, not Plaintiff. It is undisputed that ProCollect repeatedly provided an itemized Move Out Statement providing a line by line item for each category of charges sought, including rent, late charges, water and utility charges, eviction charges, and an insufficient "notice" charge as Plaintiff moved out with more than two months left on the Lease.[5] Further, Plaintiff understood and did not have a complaint with the different amounts sought to be collected by ProCollect, and the timing of those changes, including the original balance of $2,225.69, carport repairs of $1,175 that increased the amount to $3,400.69, and the special reduction to $1,999.00. *See* Exhibit "B" at p. 71, 77-78:

Q Okay. Now that you've seen the invoice for the carport repairs, do you understand why your alleged debt to Wilson Crossing went from 2,226 to 3,401?
A Yes.

[5] Plaintiff refers to the "Notice" charge in the Move Out Statement as "unexplained" or "not itemized," however, when Plaintiff was questioned about the Move Out Statement, she was not surprised by any of the charges, and did not question the amounts. *See* Exhibit "B" at pp. 15, 37-38.

Q Okay. So what I've just shown you in our CBR uploads, that also matches precisely -- now I want you to go to Exhibit 14. Yeah. Okay. Now, on Exhibit 14, this is where ProCollect provided its response to the CFPB complaint. All right. Now, if you read that response it follows exactly those uploads; that is, the consumer's original debt balance due was $2,225.69, which the CRAs round to 2,226. And then you see there, he says on October 25th, 2017, our client contacted our office and revised the balance to a higher balance of $3,400.69. That is the exact amount -- the increase is the exact amount of the carport invoice, right?

A Uh-huh.

Q Then it says on October 10th, 2017, received certified mail from the consumer, which is you, and asked us to investigate the debt. We updated the dispute and mailed proof of debt to the consumer on the same date to validate the debt. Our client extended a special reduction to assist the consumer on paying the debt and revised all balances to $1,999, right?

A Uh-huh.

Q So this is where the variety of balances are coming from, consumer can pay the $1,999 and we will have the debt removed from her -- from the credit report. Okay? And then it go on to provide some ProCollect additional information.

So exactly what they said in the C -- CFPB complaint, you also see now that they reported those exact same amounts.

A Uh-huh.

Q Right?

A Yes, sir.

Q So do you think that you still have a complaint with what ProCollect did?

A Looking from this point of view, no.

Q Okay.

      3. Even worse, Plaintiff misrepresents in the Response that,

> "…ProCollect also sent an[sic] debt collection letter demanding an unsupported $3,400, which it then changed to $1,999 based on no reason but an unexplained "secret sauce" formula of ProCollect, but which it still reported to the credit reporting agencies as $3,400 until suit was filed." Response p. 15.

Plaintiff presents **no** competent evidence that ProCollect reported $3,401 (or $3,400) to the CRAs after October 1, 2018, nor sent any letters seeking such amount. Conclusive evidence shows the reporting was changed to the reduced amount of $1,999 on November 1, 2018 forward. In addition, in January, 2019 (two months before suit was filed), ProCollect elected to cease collection and delete all reporting rather than deal with a litigious Plaintiff. *See* Exhibit "A-1" at ¶18.

4. For Plaintiff's FDCPA claims, the facts are **undisputed** that the amounts sought to be collected by ProCollect and reported by ProCollect, timely follow the amounts verified by the Original Creditor pursuant to the following timeline established by the *Declaration of David Goodhart* (Plaintiff's Exhibit "A-1") and the supporting documentation attached thereto as follows:

May, 2017: Plaintiff fails to pay May, 2017 rent, Original Creditor starts eviction proceeding, Plaintiff moves out on May 26, 2017 owing three month's rent at $1,011 per month, and in the process of moving out, damages the Original Creditor's carport, with the Original Creditor generating a Move-Out Statement dated May 26, 2017 alleging the debt amount of $2,225.69. *See* ProCollect's Exhibit "A" at ¶6, and supported by Exhibits "A-1" (Move Out Statement, PC – 0180), "A-3" (Renewal Lease showing rent at $1,011), "B" (Plaintiff deposition acknowledging responsibility for carport repairs at pp. 71 and 77-78 of transcript).

July, 2017: Original Creditor retains ProCollect to collect the alleged debt in the amount of $2,225.69, which ProCollect report to CRAs as $2,226 pursuant

to CRA guidelines rounding to nearest dollar. *See* ProCollect's Exhibit "A" at ¶6.

Oct., 2017: Original Creditor contacts ProCollect to increase the amount of the debt by $1,175 due to the carport repairs after the claim to Plaintiff's insurance carrier was denied bringing the balance to $3,400.69. *See* ProCollect's Exhibit "A" at ¶7, supported by Exhibits "A-4" (carport invoice and correspondence showing Plaintiff's insurance denied the claim because of lack of contact with insured) and Exhibit "A-5" (Account Summary verifying receipt of increase request and documentation on October 25, 2017, labeled as PC - 0265).

Nov., 2017: ProCollect, who uploads accounts to the CRAs on the first of every month, changes the amount reported from $2,226 to $3,401 on November 1, 2017. *See* ProCollect's Exhibit "A" at ¶13, supported by Exhibit "A-13" (showing the change in credit reporting from $2,226 to $3,401 on the 2017-11 Upload on Exhibit "A-13" at PC - 0245).

Oct., 2018: On October 1, 2018, ProCollect has the same monthly upload of Plaintiff's account to the CRAs at $3,401. Then, by letter dated October 3, 2018, Plaintiff, through a debt repair service, sends a dispute letter to ProCollect, for which, after receipt and when verifying same with the Original Creditor, the Original Creditor agrees to provide ProCollect with permission to seek a reduced balance to $1,999. As a result, on October 11, and again on October 19, 2018 (because the first letter was returned as undeliverable, despite being correctly addressed), ProCollect verifies the debt by sending Plaintiff a letter showing the reduced balance of $1,199 authorized by the Original Creditor and the original Move-Out Statement showing the original balance of $2,225.69. *See* ProCollect's Exhibit "A" at ¶¶ 13, 8-9, supported by Exhibits "A-13" (CBR Upload for October 1, 2018 showing the same reported amount of $3,401 on the 2018-10 Upload on Exhibit "A-13" at PC - 0245), "A-6" (Plaintiff's Oct. 3, 2018 dispute letter), "A-7" (Account Summary at PC – 0247 to 0248), "A-8" and "A-9" (verification letters attaching Move-Out Statement for balance and old lease for verification of the Original Creditor).

Nov., 2018: On November 1, 2018, ProCollect updated its reporting to the CRAs to show the reduction to $1,199. Then on November 5, 2018, Plaintiff, again through a debt repair service, sends a second dispute letter to ProCollect questioning line item amounts on the itemized Move Out Summary and questioning why ProCollect was reporting the debt at $3401. As ProCollect was not reporting the debt at $3401, ProCollect again verifies the reduced

amount of $1,999 and sent the same verification package to Plaintiff showing the current balance sought of $1,999 on the letter and attaching documents showing original balance of $2,225.69. *See* ProCollect's Exhibit "A" at ¶¶ 13, 10, supported by Exhibits "A-13" (CBR Upload for November 1, 2018 showing the updated amount of $1,999 – the 2018-11 upload on Exhibit "A-13" at PC - 0246), "A-10 (Plaintiff's Nov. 5, 2018 dispute letter), and "A-11" (verification letter attaching Move-Out Statement for balance and old lease for verification of the Original Creditor).

Dec., 2018: On December 6, 2018, again through the debt repair service, Plaintiff initiated a complaint with the Consumer Protection Bureau (CFPB) regarding the debt – and specifically complaining about the debt reporting at $3401 for a debt verified at $1999. ProCollect responded on December 7, 2018, explaining the different amounts sought and reported by ProCollect as follows:

**Company's Response**

The consumer signed a 1 year lease contract with our client. The consumer moved out 2 months prior to the lease expiring. The consumer moved out May 2017 and the lease expired July 31 2017. The consumer original debt balance due was $2,225.69 then October 25 2017 our client contacted our office and revised the balance to a higher balance of $3,400.69 and attached proof of the invoice due to the damages to the carport. On October 10 2017 we received the certified mail from the consumer and she attached her dispute and requested us to investigate the debt. We updated the dispute and mailed proof of debt to the consumer on the same date to validate the debt. Our client extended a special reduction to assist the consumer on paying the debt and revised all balances to $1,999.00, so this is where the variety of balances are coming from. The consumer can pay the $1,999.00 and we will have the debt removed from the credit report. The consumer can contact our office at toll free 1-800-732-3799 to get this matter resolved We apologize for any inconvenience and/or misunderstanding in this matter. Thank you for your time and patience in this matter

*See* ProCollect's Exhibit "A" at ¶¶ 12, supported by Exhibit "C" at CUD 0001 to CUD – 0008.

II.

<u>OBJECTION TO PLAINTIFF'S "CREDIT REPORTS"</u>

5. Plaintiff's claim that ProCollect violated FDCPA § 1692e, is largely, if not entirely predicated on the fact that Plaintiff alleges that ProCollect was reporting

Plaintiff's alleged debt as $3,401, when it had previously sent Plaintiff a validation letter showing a reduced balance in the amount of $1,999. *Cf.* PSOF numbers 7, 12, 13, and 17 (all showing the reduced balance authorized by the Original Creditor of $1,999), with PSOF number 15 (alleged reporting of $3,401). *See also*, Plaintiff's Complaint [Doc. 1] at paragraphs 15 through 21, noting that Plaintiff entered into a dismissal with prejudice with TransUnion [Doc. 25].

6. As shown by the timeline and supporting documentation above, when the alleged debt was increased from $2,225.69 to $3,401.69 by the Original Creditor on October 25, 2017, ProCollect's next upload to the CRAs on November 1, 2017, correctly reported the change. *See* highlighted portions of Exhibit "A-13" for upload on November 1, 2017 (PC – 0245). Then, when the Original Creditor agreed to reduce the alleged debt to $1,999 on October 11, 2018, ProCollect's next upload to the CRAs on November 1, 2018, correctly reported the change. *See* highlighted portions of Exhibit "A-13" for upload on November 1, 2018 (PC – 0246).

7. In Plaintiff's PSOF number 15, Plaintiff alleges, "Despite this [the verification of the debt at $1,999], Plaintiff's Credit Report dated November 3, 2018 reported a "balance" of $3,401.00 by ProCollect, citing to Plaintiff's Exhibit 9. However, Exhibit 9 is **not** a credit report from one of the three consumer reporting agencies, Experian, TransUnion or Equifax. Rather, as shown by the bottom of the Exhibit, https://www.identityiq.com/CreditReport.aspx##AccountHistory, and provided in Exhibit "A" attached hereto, Exhibit 9 was generated by a paid third-party vendor "IdentityIQ"

whose account results/reports are not authenticated. As such, ProCollect objects to Plaintiff's Exhibit 9, as well as a similar "Three Bureau Credit Report" attached to the Response as Exhibit "3" as inadmissible hearsay.[6] However, even if the Court accepted the hearsay Exhibit as some competent evidence, it supports ProCollect's position and the reporting (CBR Uploads) attached to the Motion as Exhibit "A-13" and explained in the *Declaration of David Goodhart* at paragraphs 13 and 14.

8. Plaintiff relies on Exhibit 9 to alleged that, on November 3, 2018 (the date of the hearsay Exhibit), ProCollect was reporting the debt amount as $3,401. But Plaintiff's Exhibit "9," at page 14 (labeled PC – 0076) clearly shows that the information purportedly from TransUnion, Experian and Equifax all have a "Last Reported" date of "**10/01/2018**" not November 1, 2018 or November 3, 2018.

11/3/2018 Credit Report - IdentityIQ

Experian
Equifax

PRO COLLECT (Original Creditor: 09 WILSON CROSSING APARTMENTS L)

| | TransUnion | Experian | Equifax |
|---|---|---|---|
| Account #: | 51118001218**** | 51118001218**** | 51118001218**** |
| Account Type: | Collection | Collection | Collection |
| Account Type - Detail: | Collection | Collection | Collection |
| Bureau Code: | Individual | Individual | Individual |
| Account Status: | Derogatory | Derogatory | Derogatory |
| Monthly Payment: | - | - | - |
| Date Opened: | 07/27/2017 | 07/01/2017 | 07/01/2017 |
| Balance: | $3,401.00 | $3,401.00 | $3,401.00 |
| No. of Months (terms): | - | - | - |
| High Credit: | $2,226.00 | $2,226.00 | $2,226.00 |
| Credit Limit: | - | - | - |
| Past Due: | - | - | - |
| Payment Status: | Collection/Chargeoff | Collection/Chargeoff | Collection/Chargeoff |
| Last Reported: | 10/01/2018 | 10/01/2018 | 10/01/2018 |
| Comments: | Placed for collection | - | Subject has not satisfied debt. |
| Date Last Active: | 10/01/2018 | 09/01/2017 | 10/01/2018 |
| Date of Last Payment: | - | - | - |

6 Plaintiff does not provide any predicate for the admissibility of this vendor's documents. For instance, where is the information in the report derived, is it reliable, and most importantly, how accurate is the information and what date is the information effective?

9. Meaning, the information provided by this paid third party vendor is at least one month behind it is reporting data and clearly not current on the date of the report, November 3, 2018.[7] Therefore, Plaintiff has not presented any evidence that contradicts the fact the Defendant correctly reported Plaintiff's alleged debt to the CRAs on 10012018 (October 1, 2018) as "3401" ($3,401) and on 11012018 (November 1, 2018) as "1999" ($1,999) as provided by Defendant's Exhibit "A-13" (PC – 0245 and 0246).

III.

THE LAW REGARDING VERIFICATION REQUIREMENTS

10. As detailed above, Plaintiff's Response often misrepresents to the Court that ProCollect provided "un-itemized statements" or that ProCollect failed to verify the amount due and includes significant briefing on verification. However, Plaintiff did not allege a claim that ProCollect for failure to timely validate the account pursuant to

[7] Compare Plaintiff's Exhibit "9" (the November 3, 2018 hearsay Three Bureau Credit Report at PC – 0076), with Plaintiff's Exhibit 3 (the September 29, 2018 hearsay Three Bureau Credit Report at PC – 0049) where the last reported date is also one to two months behind, reporting as of "09/01/18" for Experian and Equifax and "08/01/18" for TransUnion:

PRO COLLECT (Original Creditor: 09 WILSON CROSSING APARTMENTS L)

| | TransUnion | Experian | Equifax |
|---|---|---|---|
| Account #: | 51118001218**** | 51118001218**** | 51118001218**** |
| Account Type: | Collection | Collection | Collection |
| Account Type - Detail: | Collection | Collection | Collection |
| Bureau Code: | Individual | Individual | Individual |
| Account Status: | Derogatory | Derogatory | Derogatory |
| Monthly Payment: | - | - | - |
| Date Opened: | 07/27/2017 | 07/01/2017 | 07/01/2017 |
| Balance: | $3,401.00 | $3,401.00 | $3,401.00 |
| No. of Months (terms): | - | - | - |
| High Credit: | $2,226.00 | $2,226.00 | $2,226.00 |
| Credit Limit: | - | - | - |
| Past Due: | - | - | - |
| Payment Status: | Collection/Chargeoff | Collection/Chargeoff | Collection/Chargeoff |
| Last Reported: | 08/01/2018 | 09/01/2018 | 09/01/2018 |
| Comments: | Placed for collection | - | Subject has not satisfied debt. |
| Date Last Active: | 08/01/2018 | 09/01/2017 | 09/01/2018 |
| Date of Last Payment: | - | - | - |

FDCPA § 1692g. Even if Plaintiff had made such a claim, ProCollect wholly complied with the FDCPA verification requirements – the purpose of which are to provide the debtor with sufficient information to know whether to dispute the debt. *See Mack v. Progressive Fin. Servs.*, 2015 U.S. Dist. LEXIS 1803, *7-8 (E.D. Tex. 2015):

> The FDCPA does not define what constitutes proper debt verification, nor has the Fifth Circuit specifically addressed the requirements of verification under the FDCPA. Since verification is undefined by the FDCPA the Court "carries its ordinary meaning." *Thompson v. Somervell County*, 431 F. App'x 338, 341 (5th Cir. 2011) (quoting *Crawford v. Metro. Gov't of Nashville & Davidson Cnty*, 555 U.S. 271, 129 S. Ct. 846, 172 L. Ed. 2d 650 (2009)); *Garland v. Roy*, 615 F.3d 391, 399 (5th Cir. 2010). "This meaning must be determined 'from the context in which [the words] are used.'" *Martin v. Alamo Community College Dist.*, 353 F.3d 409, 412 (5th Cir. 2003) (quoting *Thompson v. Goetzmann*, 337 F.3d 489, 497 (5th Cir. 2003)). "Dictionaries are a principal source for ascertaining the ordinary meaning of statutory language[.]" *Id*. (citations omitted).
>
> Verification is defined as "the act or process of verifying or the state of being verified: the authentication of truth or accuracy by such means as facts, statements, citations, measurements, or attendant circumstances" by Webster's Unabridged Third New International Dictionary (1986). The Court does not find that this dictionary definition is helpful.
>
> Other circuit courts addressing this provision of the FDCPA has determined that verification is not intended to give a debtor a detailed accounting of the debt to be collected. Instead, "[c]onsistent with the legislative history, verification is only intended to eliminate the problem of debt collectors dunning the wrong person or attempting to collect debts which the consumer has already paid." *Chaudhry*, 174 F.3d at 406; *Dunham v. Portfolio Recovery Assocs., LLC*, 663 F.3d 997, 1003 (8th Cir. 2011); *Clark v. Capital Credit & Collection Servs., Inc*., 460 F.3d 1162 (9th Cir. 2006). In *Clark*, the Ninth Circuit adopted the standard as articulated by the Fourth Circuit, holding that "[a]t the minimum, 'verification of a debt involves nothing more than the debt collector confirming in writing that the amount being demanded is what the creditor is claiming is owed.'" *Id*. at 1173-1174 (quoting *Chaudhry*, 174 F.3d at 406).

*See also*, *Ghanta v. Immediate Credit Recovery, Inc*., 2017 U.S. Dist. LEXIS 67726, *19-21 (N.D. Tex. 2017):

> The FDCPA does not define what constitutes sufficient debt verification, and the Fifth Circuit has not directly addressed the issue. Accordingly, verification will carry its ordinary meaning. *United States v. Santos*, 553 U.S. 507, 511, 128 S. Ct. 2020, 170 L. Ed. 2d 912 (2008). Verification is defined as an "acknowledgment" or "recognition of something as being factual." *See* Black's Law Dictionary (defining "verification" as "acknowledgment" and "acknowledgment" as "recognition of something as being factual") (10th ed. 2014); *see also* Webster's Unabridged Third New International Dictionary (1986) (defining "verification" as "the act or process of verifying or the state of being verified: the authentication of truth or accuracy by such means as facts, statements, citations, measurements, or attendant circumstances"). This Court finds that the dictionary definitions of verification shed limited light on the sufficiency or insufficiency of Defendant's portal letter. *See Mack v. Progressive Fin. Servs., Inc.*, No. 4:13-CV-544, 2015 U.S. Dist. LEXIS 1803, 2015 WL 123742, at *3 (E.D. Tex. Jan. 8, 2015) (finding the dictionary definition of verification unhelpful and resorting to other circuit courts' interpretations of the statutory requirement); see *also Haddad v. Alexander, Zelmanski, Danner & Fioritto, PLLC*, 758 F.3d 777, 782 (6th Cir. 2014).
>
> Circuit courts that have addressed the FDCPA's verification requirement found that it requires, at a minimum, enough information to allow the consumer to "sufficiently dispute the payment obligation." *Haddad*, 758 F.3d at 785. Debt verification under the FDCPA usually requires "an itemized accounting detailing the transactions in an account that have led to the debt" because it allows the consumer to determine if he or she actually owes the debt. *Haddad*, 758 F.3d at 777, 782. Some circuits have adopted a lower requirement for verification—requiring only that the debt collector confirm the amount being demanded is equivalent to the amount the creditor claims is owed. *Clark v. Capital Credit & Collection Servs., Inc.*, 460 F.3d 1162, 1173-74 (9th Cir. 2006) (quoting *Chaudhry v. Gallerizzo*, 174 F.3d 394, 406 (4th Cir. 1999)).

Based on these requirements, even if Plaintiff had asserted a claim pursuant to FDCPA § 1692g, the fact that Plaintiff already disputed the items, and was provided an itemized Move Out Statement, ProCollect complied with any obligations to provide proper verification of Plaintiff's account.

IV.

THE LEAST SOPHISTICATED CONSUMER CANNOT
IGNORE SUBSEQUENT COMMUNICATIONS NOR RELY ON UNPLED CLAIMS

11. Plaintiff also submitted significant briefing regarding whether ProCollect's "letters" provided a fact question as to Plaintiff's FDCPA claims. However, Plaintiff's Complaint fails to include allegations that any letters written by ProCollect constituted a violation of FDCPA § 1692e, nor were such facts disclosed in discovery. Rather, the Complaint focuses solely on ProCollect's reporting. *See* Doc. 1. As Plaintiff did not seek any leave to amend to assert § 1692e claims regarding ProCollect's letters, Plaintiff cannot rely on such new claims to avoid summary judgment. *See Cutera v. Bd. Of Supervisors*, 429 F.3d 108, 113 (5th Cir. 2005) (A claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court. *Fisher v. Metropolitan Life Ins. Co.*, 895 F.2d 1073, 1078 (5th Cir. 1990)).

12. Even if the Court considers such new claim, the Court cannot review the debt verification letters in a vacuum and comply with the requirements of the least sophisticated consumer ("LSC") standard.[8] Plaintiff advocates to apply the LSC standard solely when reviewing the letter but expects the Court to ignore the additional written communications included with ProCollect's evidence. Such evidence, which Plaintiff wholly failed to provide any contradictory evidence, establishes the reasons for the three

[8] ProCollect advocates that the LSC standard should not apply to any of the dispute letters or verification letters in response because all such communications were actually between ProCollect and Plaintiff's debt repair service, Cut Up Debt. *See* Exhibit "A-1" at ¶ 3 and Exhibit "C."

different debt amounts – the original balance, the increased balance for the carport damages, and the special reduction to assist Plaintiff in paying the alleged debt. *See* ProCollect's CFPB Response recited in full on p. 7 *supra* (Exhibit "C").

13. The least sophisticated consumer standard requires that "even the least sophisticated consumer could be presumed to possess a rudimentary amount of information about the world and a willingness to read [letters] with some care." *See Clomon v Jackson*, 988 F.2d 1314, 1319 (2nd Cir. 1993) citing *Johnson v. NCB Collection Services*, 799 F. Supp. 1298, 1306-07 (D. Conn. 1992).[9] Here, as proven by Plaintiff's testimony that she understood the different amounts and reasons for them provided *supra*, even the LSC (and particularly one represented by a debt repair company), would understand that $1,999 amount sought in the two verification letters she received is LESS than the amount Plaintiff owes. *See e.g., Landes v. Cavalry Portfolio Services, LLC*, 774 F. Supp. 2d 800, 803 (E.D. Va. 2011) ("Finally, simply offering to discount a debt to encourage the consumer to pay promptly is in no way a deceptive or unconscionable debt collection practice. *See Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 399 (6th Cir. 1998) ("To hold that a debt collector cannot offer payment options as part of an effort to resolve an outstanding debt… is clearly at odds with the language and purpose of the FDCPA.").

[9] *See also White v. Goodman*, 200 F.3d 1016, 1020 (7th Cir. 2000) (Posner, C.J.) ("Any document can be misread. The Act is not violated by a dunning letter that is susceptible of an ingenious misreading, for then every dunning letter would violate it. The Act protects the unsophisticated debtor, but not the irrational one."); *See also Gonzalez v. Kay*, 577 F.3d 600, 609 (5th Cir. 2009) (Jolly, J. dissenting) ("Because the unsophisticated [/least sophisticated] consumer is literate and concerned with his own financial affairs, we must conclude that he will read the letter with some care…").

V.

## FIFTH CIRCUIT DISTRICT COURT OPINIONS SUPPORT SUMMARY JUDGMENT ON PLAINTIFF'S TDCA & FDCPA § 1692E CLAIMS

14. As previously briefed in the Motion, to survive summary judgment for a claim under 15 U.S.C. § 1692e(2)(A), Plaintiff would have to show that ProCollect knowingly misrepresented the character, amount, or legal status of the debt. *Ducrest v. Alco Collections, Inc.*, 931 F. Supp. 459, 462 (M.D. La. 1996).[10] Another Fifth Circuit district court case directly on point involved ProCollect ten years ago. *See Cole v. ProCollect, Inc.*, 2010 U.S. Dist. LEXIS 142667, at *25 (S.D. Tex. Dec. 23, 2010):

> To state a claim under Section 1692e(2)(A) of the FDCPA, Plaintiff is required to show that Defendant knowingly misrepresented the character, amount or legal status of the debt. *Ducrest v. Alco Collections, Inc.*, 931 F. Supp. 459, 462 (M.D. La. 1996). However, under the FDCPA, debt collectors may rely on the representations made to them by their clients. *DuCrest v. Alco Collections, Inc.*, 931 F.Supp. 459, 462 (M.D. La. 1996). The FDCPA does not require debt collectors to conduct an independent investigation of the information provided to them by clients. *Jenkins v. Heintz*, 124 F.3d 824, 834 (7th Cir. 1997), *cert denied*, 523 U.S. 1022, 118 S. Ct. 1304, 140 L. Ed. 2d 469 (1998).
>
> Plaintiff alleges that Defendant violated Section 1692e(2)(A) of the Fair Debt Collection Practices Act ("FDCPA") by accusing Plaintiff of owing a debt that he does not owe. (Instrument No. 1, at 3). However, Defendant argues that Plaintiff's belief that he does not owe the debt is not sufficient

---

[10] *See Ducrest v. Alco Collections*, 931 F. Supp. 459, 462 (M.D. La. 1996):

> The language "false representation of the character, amount, or legal status of any debt" in § 1692e(2)(A) must be read in conjunction with what it defines – a "false, deceptive, or misleading representation." These terms clearly contemplate a knowing and intentional act. It is undisputed that defendant relied on the information provided to it by Broadmoor Plantation Apartments in demanding payment of this debt. Plaintiff's claim under this section of the FDCPA has no merit because she has not shown that any misrepresentation of the amount of the debt claimed was knowing or intentional.

> evidence to show a violation because Defendant verified the debt with Chisholm Trails. (Instrument No. 22, at 12-14).
>
> Here, the record does not contain any evidence showing that Defendant made any intentional misrepresentations regarding the alleged debt of $8,669.80 to Chisholm Trails Apartments ("Chisholm Trails"). To the contrary, Defendant has stated that they contacted Chisholm Trails in order to verify the debt, and Plaintiff has admitted that invoices from Chisholm Trails show that Chisholm Trails stated that Plaintiff owed them $8,699.80. (*See* Instrument No. 23-2, at 5; Instrument No. 26-5, at 10). Although the record does not contain the invoices or any other documents from Chisholm Trails confirming the basis for the alleged debt, Plaintiff's admission, combined with Defendant's assertion that they verified the debt, is sufficient to establish that Defendant relied upon Chisholm Trails' representations about the debt. Furthermore, Defendant was not required to conduct an independent investigation to determine whether Chisholm Trails' representations were correct. *See Jenkins v. Heintz*, 124 F.3d 824, 834 (7th Cir. 1997), *cert denied*, 523 U.S. 1022, 118 S. Ct. 1304, 140 L. Ed. 2d 469 (1998). Because the FDCPA allows Defendant to rely upon Chisholm Trails' representations about the debt, *see DuCrest v. Alco Collections, Inc.*, 931 F.Supp. 459, 462 (M.D.La. 1996), the Court finds that Plaintiff's claim that Defendant violated Section 1692e(2)(A) of the FDCPA fails as a matter of law.

15. Simply, there is no violation of § 1692e(2)(A) or 1692e(10) (nor the TDCA equivalent – Tex. Fin. Code § 392.308) when the debt collector seeks collection of a verified debt, regardless of whether the debtor believes the amount is owed, challenges the amount owed, or complains about the assignment of the debt – the debt collector is entitled to rely upon the representations of its creditor clients. *See Jenkins v. Heintz*, 124 F.3d 824, 834 (7th Cir. 1997) *cert. denied* 523 U.S. 1022 (1998) ("A debt collector is entitled to rely on the representations of its creditor clients without further investigation."); *see also*, *Ducrest v. Alco Collections*, 931 F. Supp. 459, 462 (M.D. La. 1996); and *Howe v. Reader's Digest Ass'n, Inc.*, 686 F. Supp. 461, 467 (S.D.N.Y. 1988). When the creditor/client informs the debt collector that account is valid, the debt collector

may presume it is valid without the necessity of independently verifying its validity. *See Choudhry v. Gallerizzo*, 174 F. 3d 394, 406 (4th Cir. 1999), *cert. denied* 528 U.S. 891 (1999).

16. Even without the reliance on a verified debt, Plaintiff failed to present any non-conclusory evidence that identifies a false, misleading or deceptive means to attempt to collect a debt that would support a fact question. Just because the amounts changed over time, with an explained addition and then explained special reduction provided by the CFPB response, or that Plaintiff may not know how a particular amount was calculated under the Lease for breaching it early in the Move Out Statement, doesn't make ProCollect's reporting of those different debt amounts, nor communicating the discount in a verification letter or CFPB response, an FDCPA violation.

VI.

NO FCRA VIOLATION EXISTS AS A MATTER OF LAW

17. Plaintiff first argues that the amount that ProCollect reported to the CRAs was "patently false" claiming that "Defendant is unable to produce a complete and definitive record of Plaintiff's alleged debt." Response at p. 23. Utterly remarkable to argue that ProCollect knowingly furnished false information in violation of FCRA § 1681s-2(a) when the summary judgment evidence conclusively establishes that the amounts reported directly and timely correspond to (1) the amount verified with the Original Creditor on the Move Out Statement (Exhibit "A-1"), (2) the increased amount for the $1,175 carport damages (Exhibit "A-4" and "A-5") for which Plaintiff

understands they caused when moving out (Exhibit "B"), and (3) the special reduction authorized by the Original Creditor (Exhibit "A-7" at PC – 0248). *See supra* at Paragraph 4 and Exhibit "A-13."

18. Similarly remarkable, Plaintiff's Response scoffs that ProCollect would obtain a reduction of the debt authorized by the Original Creditor, calling the gesture "magical" and then making light of the fact that ProCollect's corporative representative calls the reduction "gracious" or that he doesn't want to reveal its proprietary methods for collection. Plaintiff misrepresents that the "numbers are all over the place from $1925 to $3400," without any support or cites to the record, and without contradicting that ProCollect reported precisely the correct amounts, and in a timely fashion, as provided *supra* at Paragraph 4.

19. Second, Plaintiff has the burden to show the ProCollect's investigation was not reasonable to establish an FCRA § 1681s-2 violation. But Plaintiff starts the argument by relying, not on the dispute letters sent to TransUnion or other CRAs as required for the analysis, but the letters sent directly to ProCollect, for which ProCollect responded with verification letters and attachments. Response, p. 27. The letters at issue to the CRAs provide **no** information to investigate. *See* Exhibit "A-14" (letters only dispute the debt, without stating any reasons or providing any contrary proof which results in only dispute codes in the ACDs to ProCollect – *See* Exhibit "A" at ¶¶ 15-16). Despite the lack of any information or contrary proof to investigate in Plaintiff's dispute letters, Plaintiff advocates that ProCollect, to perform a reasonable investigation, must

determine if the amounts in the Move Out Statement verified by the Original Creditor are legally provided for in the Lease, and that an email containing documents that show it is the debtor's insurance that declined to pay for the carport damages that the Original Creditor verifies were attributable to Plaintiff's account were actually caused by the Plaintiff. Such requirements do not exist under the FCRA as provided by the authority previously provided in the Motion.

20. ProCollect's Policies and Procedures provided at Exhibit "A-15" and described by ProCollect at Exhibit "A" at ¶¶ 17 satisfy the reasonable investigation requirements of the FCRA for data furnishers and no genuine issue of fact exists. Even if there was some sliver of doubt as to the claim, such claim immediately ceased when Plaintiff could not identify any reported amount that was incorrect at her deposition. *See supra* at Paragraph 2 citing Exhibit "B" at p. 71, 77-78 (Plaintiff understood and did not have a complaint with the different amounts sought to be collected by ProCollect, and the timing of those changes, including the original balance of $2,225.69, carport repairs of $1,175 that increased the amount to $3,400.69, and the special reduction to $1,999.00). *See Edeh v. Midland Credit Mgmt.*, 748 F. Supp. 2d 1030, 1039-40 (D. Minn. 2010) (For a consumer to bring a claim against furnishers [like ProCollect] for the failure to conduct a reasonable investigation, the consumer must show the challenged information is in fact inaccurate) (citing *Chaing v. Verizon New England, Inc.*, 595 F.3d 26, 29-38 (1st Cir. 2010)).

PRAYER

Defendant moves the Court to grant summary judgment in Defendant's favor on all of Plaintiff's claims, or in the alternative, partial summary judgment on such claims as the Court determines. Defendant prays for all other and further relief to which it may be entitled.

Respectfully submitted,

By: ______________________________
JOHN W. BOWDICH
State Bar No. 00796233

BOWDICH & ASSOCIATES, PLLC
8150 N. Central Expy., Suite 500
Dallas, Texas 75206
(214) 307-9500 – Telephone
(214) 307-5137 – Telecopy
jbowdich@bowdichlaw.com

ATTORNEYS FOR DEFENDANT
PROCOLLECT, INC.

CERTIFICATE OF SERVICE

On February 3, 2020, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Eastern District of Texas, Tyler Division using the electronic case filing system of the court, thereby providing service to all parties.

Beth Findsen, Esq.
PRICE LAW GROUP, APC
8245 N. 85th Way
Scottsdale, AZ 85258
ATTORNEYS FOR PLAINTIFF

VIA ECF

By: ______________________________
JOHN W. BOWDICH